**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | |
| : | **Case No. 1:19-mj-00289 (GMH)** |
| **JOY UTOKANANDU,** : | |
| : | |
| **Defendant.** : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States respectfully submits this Memorandum in support of its motion for pretrial detention pursuant to 18 U.S. C. § 3142(f)(2)(A).

**BACKGROUND**

At approximately 4:46 am on November 21, 2019, the defendant, Joy Utokanandu, without authorization, drove her vehicle over the first set of security bollards located at 17th Street and Pennsylvania Avenue, NW.  Those bollards, as well as the second set behind them, serve to restrict vehicular access to the 1600 block of Pennsylvania Avenue (i.e., directly in front of the White House).  The defendant drove over the bollards and into the restricted area by following immediately behind a United States Secret Service (USSS) special agent who was reporting for work and was authorized to proceed into the restricted area.  The restricted area is posted with two large Stop signs, a Do Not Enter Sign, and a large Authorized Vehicles Only Sign, all of which the defendant ignored.

The Uniformed Division (UD) officer who was working the access post, Officer Tuzzolo, approached the defendant and asked where she was going.  The defendant advised that she was "with him" and pointed to the agent's vehicle in front of hers.  Officer Tuzzolo informed the defendant that was fine, but that she still needed to produce her credentials and have her car swept

by the Canine Officer working the post.  When Officer Tuzzolo then asked the defendant to back up, she put her vehicle in reverse, but did not back up.  After Officer Tuzzolo reiterated that she needed to back up, the defendant simply rolled up her window approximately half way and did not move.

In response to the defendant's actions and statements, Officer Tuzzolo spoke with the agent whose vehicle the defendant followed in.  The agent indicated that he had no idea who the defendant was.  Officer Tuzzolo then raised the second set of security bollards in front of the agent's car.  The agent then stepped out of his vehicle and asked the defendant for identification, at which time the defendant produced her Texas State driver's license.  While the agent was speaking with the defendant, Offier Tuzzolo voiced over the radio that there was an unauthorized entry at his post and requested assistance.

A UD Lieutenant who responded declared the defendant's vehicle suspicious and that the area around the White House, the Treasury Building, and its grounds be locked down and placed in condition yellow due to the defendant's unauthorized entry.  As a result of the condition change, individuals were cleared from the 1600 block of Pennsylvania Avenue, Lafayette Park, and both sides of 17th Street from New York Avenue to H Street, NW.  Pennsylvania Avenue was also closed to vehicular traffic between 17th and 18th Streets, NW.  Metropolitan Police Department (MPD) Explosive Ordinances Division (EOD) was also dispatched to the scene to investigate.  Entry and movement of authorized individuals within the White House Complex was restricted to the south side of the White House Complex.

At the request of another UD officer who responded to the scene and recognized the defendant, the defendant exited her vehicle and was moved away from it.  A canine sweep of her vehicle was then performed, yielding negative results.

After being read her Miranda rights, the defendant explained to the responding protective intelligence agents that she had followed the agent inside the restricted area because she had twice this year been invited to come to the White House to be with the Trump family.  The defendant further advised that – through tweets – her husband, Donald Trump, gave her permission to follow the vehicle inside the restricted area.  Reiterating that she was there to be with the Trump family, the defendant disavowed wanting to harm the President or taking medication.  As to her residence, the defendant advised USSS personnel that she had been staying at the Hilton Washington Hotel, but had run out of money and was now living in her vehicle.  The defendant terminated the conversation after one of the agents advised the defendant that the agent could not provide her with any money, but could offer information about homeless shelters and other assistive services.  The defendant was then arrested and transported.

This incident occurred approximately three hours after the USSS had conducted a welfare check on the defendant earlier that morning when she was discovered sleeping in her vehicle on 17th Street, NW.  In light of the USSS's familiarity with the defendant as detailed below and concerns over her mental state, the USSS contacted the District's Comprehensive Psychiatric Emergency Program (CPEP) during the welfare check. ███████████████████████████ ███████████████████████████ ███████████████████████████ .  As a result, the defendant was sent on her way.

*Defendant's Prior Interactions with Washington, D.C. Law Enforcement*

The defendant is well known to the USSS, having first come to its attention on September 21, 2019, when U.S. Capitol Police (USCP) notified the USSS about the defendant.  Earlier that day, the USCP conducted a traffic stop of the defendant during which the defendant advised that she had left Texas that Wednesday (i.e., the 18th) and drove to Washington, D.C. so the President

could help her.  The defendant indicted that she was going to get a hotel room and intended to stay in Washington, D.C.  The defendant also stated that she had $200 in cash at that time.[1]

As a result of that interaction, the USSS opened a protective intelligence investigation of the defendant.  Open source research revealed two social media accounts, neither of which reflected recent activity of the defendant's.  The Facebook account, however, contained some older posts from what appeared to be concerned family and friends inquiring about her whereabouts and well-being.  No protective intelligence content was located on either account.

A records check revealed that, upon release from jail in March 2019 for her arrest for public intoxication, the defendant refused to leave and stated people were watching her.  The defendant reportedly appeared disoriented and said she had been talking to God and that he had been telling her to do things.  After some resistance, officers from the Bedford Police Department took the defendant into custody for an emergency evaluation.

Interviews with the defendant's ex-husband and older son revealed that the defendant began having mental health issues in January 2019, around the time she lost her job as a nurse practitioner, and that her mental health has deteriorated since then.  He advised that in March 2019, the defendant went to the Dallas-Fort Worth Airport parking lot and claimed people were trying to kill her.  As a result, she was taken into custody by the Bedford Police Department and ███ ████████████████████████████████████████████████████████████ ████████████████████  The defendant, however, refused to acknowledge any mental health issues and ████████████████████████████████████████, despite the urging of family members.  The defendant's ex-husband also informed the USSS that her mental state has only

---

[1] Through corroborative interviews, the USSS subsequently learned that on that same date, the defendant also told one of her sons that she was dying and would surely die if she remained in the Dallas area. The defendant advised her son that she had to move to Washington, DC to asked President Trump to help her.
[2] ████████████████████████████████████████████████████████████████████

deteriorated since then and that she continues to refuse help from family and or medical professionals. As a result, he believes her ███████████████████████████ have increased. To the best of the ex-husband's knowledge, the defendant's family, including her mother and brothers, have severed contact with her due to her increasing instability and ███.

The defendant's older son confirmed the ex-husband's statements, indicating that he and his brother have witnessed her increasing ████████████ firsthand through their weekly visits with her. The son further explained that their weekly visits became harder to sustain because of her deteriorating condition.

Both individuals agreed that the defendant has never been known to be violent, pose a threat to anyone, or possess weapons. Nor has the defendant been known to indicate an interest in any USSS protectees or wish them harm.

As detailed in the Complaint filed on November 21, 2019 (ECF No. 1), and which is incorporated by reference, the USSS has had numerous interactions with the defendant since the USCP's initial notification to the USSS. In many of those instances, the defendant made statements that indicated ████████████ thought. Such statements include believing that Donald Trump is her husband; that the President authorized her to follow the agent into the restricted area; and that Eric Trump gave her a code she could use to access the White House and its restricted areas.

**ARGUMENT**

As the defendant's competency is currently in question, the Court should defer ruling on the government's request for detention until after a competency evaluation, a competency hearing,

and any necessary period of competency treatment.[3]  "[I]f there is reasonable cause to believe that a defendant has a mental disease rendering hi/m unable to understand the nature and consequences of the proceedings and against him and/or to assist in his defense, it makes sense that the preliminary hearing and detention hearing be deferred until such time as the defendant has been determined to be mentally competent." *United States v. Moser*, 541 F. Supp. 2d 1235, 1237 (W.D. Okla. 2008).  *But see*, "[T]he need for scrutinizing a defendant's understanding of the proceedings at initial phases appears to be somewhat lesser than during trial." *United States v. Crawford*, 738 F. Supp. 564, 565 (D.D.C. 1990).  Where there are concerns about a defendant's competency to understand the proceedings, it is also difficult to assess in any meaningful way the defendant's risk of flight.

Section 3142(g) lists four factors that guide a court's detention decision: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. §3142(g).  The D.C. Circuit has recognized that a court may take into account a defendant's mental health when deciding whether the defendant should be detained pending trial or released on conditions.  *See United States v. Weissberger*, 951 F.2d 392, 399 (D.C. Cir. 1991).  Likewise, the Bail Reform Act itself instructs courts to consider a defendant's "mental condition."  18 U.S.C. § 3142(g)(3).

At a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).  A judicial determination that a

---

[3] At the initial appearance on November 22, 2019, the Government requested a competency hearing pursuant to 18 U.S.C. § 4241(a) and a competency screening pursuant to 18 U.S.C. §§ 4241(b).  The Court ordered a twenty-four evaluation, which is currently scheduled for December 2, 2019.

defendant should be detained pending trial as a serious risk of flight need only be supported by a preponderance of the evidence. *United States v. Vortis*, 785 F.2d 327, 328 (D.C. Cir. 1986).

If the Court is inclined to rule on detention at the hearing on November 26, 2019, the Court should find that, by a preponderance of the evidence, no condition or combination of conditions would reasonably assure the defendant's appearance at this time.

### **Factual Proffer**

The defendant is charged with entering and remaining in, and attempting to enter and remain in, a restricted area, and the Government's evidence that she did so is strong. Defendant was seen by a number of USSS law enforcement personnel driving her vehicle up to and over the first set of bollards that were lowered to allow the vehicle in front of her to proceed.[4] Due to the presence of the defendant's vehicle in the restricted area, the defendant's actions also necessitated restrictions on movement in and around the White House and its grounds, as well as the response of multiple federal and local assets to ensure that there was no safety concern attendant to her vehicle. As a result, morning rush hour traffic was also worse than normal due to road closures around the White House, including the stretch of Pennsylvania Avenue, NW between 17th and 18th Street, NW, and parts of 17th Street itself.

As related to her history and characteristics, the defendant is unemployed, having lost her job as a nurse practitioner around January 2019, which appears to be when she began to exhibit signs of mental illness. The defendant has no apparent ties to the District of Columbia, traveling here solely to seek out the President. The defendant initially lived in a hotel, but now lacking any financial means to assist herself, is living in her vehicle. Even back in Texas, her familial support

---

[4] Given the surveillance set-up of the White House and its surrounding areas, there is also likely video of the incident; however, at the time of the filing of this Memorandum, the undersigned SAUSA has not yet been affirmatively advised that the incident was caught on any of the cameras.

appears limited. Her mother and brothers appear to have severed contact with her, and her contact with her ex-husband and sons appears to have become more limited and strained as a result of her mental health issues.

Most importantly though, the defendant's mental health renders her unreliable and unlikely to adhere to court orders. In an interview with USSS protective intelligence agents, the defendant indicated that she had been invited, though tweets, by the President (whom she believes to be her husband) to visit the White House. Additionally, based on statements made in prior interactions with the USSS, the defendant has been hearing what she believes is the voice of God, and is at times, acting on what that voice is telling her. Indeed, it was the voice telling her to leave Texas and go to Washington, DC so the President could help her. The defendant also refuses to acknowledge her mental health issues, ███████████████████████████████████
███

Additionally, as detailed above, the defendant did not follow all the instructions given her by Officer Tuzzolo when she made her unauthorized entry into the restricted area. As the Pretrial Services Agency (PSA) noted, the defendant failed to appear for a November 20, 2019, court hearing on her public intoxication charge. *See* PSA Report, Lock-Up Date, November 22, 2019 at 4.[5] Thus, she has already demonstrated an inability and/or unwillingness to comply with lawful orders.

As to the risk her release would pose to the safety of others or the community, while she has allegedly never been violent, the potential for such behavior cannot be discounted given her

---

[5] Despite her failure to appear, the local court advised PSA that no bench warrant has been issued at this time. The lack of a bench warrant is not determinative though – the relevant and undisputed issue is that the defendant failed to appear as ordered by the court.

apparent willingness to listen and act upon the voice she is hearing. What if the voice were to tell her to hurt someone or herself?

## **Conclusion**

For the foregoing reasons, the government requests that the Court order that the defendant be detained pending trial as a serious risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A).

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845


By:      /s/
REAGAN N. CLYNE
Special Assistant United States Attorney
Virginia Bar No. 74767
United States Attorney's Office
National Security Section
555 Fourth Street, N.W.
Washington, DC  20530
Reagan.Clyne@usdoj.gov
(202) 252-7215
